# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

## CIVIL ACTION NO. 18-10578-RGS

## MICHAEL COWELS and MICHAEL MIMS

### v.

## THE FEDERAL BUREAU OF INVESTIGATION, CHRISTOPHER WRAY, and PAULA WULFF

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

### August 7, 2018

STEARNS, D.J.

In February of 2015, after Michael Cowels and Michael Mims (together, plaintiffs) had spent over 20 years in state prison for first-degree murder, the Massachusetts Supreme Judicial Court vacated their convictions and ordered them retried based on "newly discovered evidence." In sum, post-conviction DNA testing on a bloody towel with which plaintiffs were said to have wiped their hands after stabbing the victim revealed no trace of either of their DNA (or of the female victim's), but rather the DNA of an unidentified male. As counsel for Cowels and Mims prepared for the retrial in Superior Court, the Commonwealth ordered a DNA test of a used condom that had been found by police in the vicinity of the murder. This test also

yielded the profile of an unidentified male.  On counsel's motion, and over the Commonwealth's objection, a Superior Court judge ordered the profile to be uploaded into the Massachusetts State DNA Index System (SDIS), the state component of the national Combined DNA Index System (CODIS) – but no matches were returned.  Counsel then sought an order from the Superior Court directing the Federal Bureau of Investigation (FBI) to enter the unidentified DNA profile into the National DNA Index System (NDIS) or to perform a "keyboard search" in hopes of finding a match.  The Superior Court judge refused, citing a lack of jurisdiction to issue the proposed order. The FBI then declined counsel's request to enter the profile into NDIS, after determining that it was ineligible because it did not appear to be attributable to a potential perpetrator.  Plaintiffs brought this lawsuit in the federal district court, seeking the same injunctive and declaratory relief that had been denied by the Superior Court.  Before this court is a motion by defendants to dismiss the Complaint.

## BACKGROUND

In 1994, Congress passed the DNA Identification Act, which authorized the Director of the FBI to establish "a national identification index of DNA records."  34 U.S.C. § 12592(a); Compl. ¶ 25; FBI's Mem. in Supp. of Its Mot. to Dismiss (FBI's Mem.) at 2.  Subsequently, the FBI created the Combined

DNA Index System (CODIS), a DNA database which "identifies serial criminals by linking DNA evidence obtained from two or more crime scenes," as well as comparing "crime scene evidence to DNA profiles from offenders, thereby providing investigators with the identity of the putative perpetrator." *Id.* at 3; Compl. ¶ 25.  CODIS operates on both the state and the national level – the State DNA Index System (SDIS) is administered by participating states, and the National DNA Index System (NDIS) is managed by the FBI.  *Id.* ¶ 26.

FBI procedures for maintaining the integrity of NDIS are set out in the NDIS Operational Procedures Manual (NDIS Manual).  *Id.* ¶ 27.  According to the Manual, a DNA record is considered "eligible for inclusion in NDIS if it 'originate[s] from and/or [is] associated with a crime scene,' 'the source of which is attributable to a putative perpetrator.'"  *Id.* ¶ 28 (quoting NDIS Manual at 27).  An eligible record is generally "recovered directly from a victim (such as a sexual assault evidence kit), the victim's clothing, or the crime scene, and [is] believed to be attributable to the putative perpetrator." FBI's Mem. at 3.  Eligibility determinations are made by trained technicians and scientists, in compliance with state and federal requirements.  *Id.*  While normally DNA profiles are uploaded into the NDIS for analysis, the FBI can also perform what is known as a "keyboard search," which, according to plaintiffs (although the point is not conceded by the FBI), allows a DNA

3

profile to be compared with others stored in the database without uploading it permanently in NDIS.  Compl. ¶ 30.

## THE CRIME AND ITS AFTERMATH

Belinda Miscioscia was stabbed to death in June of 1993; her body was discovered in a "lover's lane" behind a Chelsea, Massachusetts woodworking shop.  *Id.* ¶ 15; FBI's Mem. at 4.  In December of 1994, Cowels and Mims were convicted by a Superior Court jury of the murder of Miscioscia.  Compl. ¶ 16.  More than 20 years later, in February of 2015, the Massachusetts Supreme Judicial Court ordered a new trial.  *See Commonwealth v. Cowels*, 470 Mass. 607, 624 (2015).

While searching the area of the "lover's lane" where Miscioscia's body was found, Massachusetts state police came upon a used condom, which was eventually tested for hair, fibers, and the presence of seminal fluid.  *Id.* ¶ 19.  Although seminal fluid was detected, it was not subjected to DNA testing prior to the original murder trial.  *Id.*  In January of 2017, acting on a request from the Commonwealth, Amy Joy, a "forensic scientist with the Massachusetts State Police Crime Laboratory," tested swabs taken from the condom.  *Id.* ¶¶ 22-23; FBI's Mem. at 4.  Joy detected a male DNA profile that did not match either plaintiff; however, she ultimately determined that "the swabs were ineligible for inclusion in CODIS."  *Id.*

In October of 2017, plaintiffs filed a motion in the Massachusetts Superior Court to compel the Commonwealth to submit the newly revealed DNA profile to CODIS.  Compl. ¶ 32.  The Commonwealth opposed the motion on grounds that "the DNA profile did not meet FBI standards for inclusion."  FBI's Mem. at 4.  The Superior Court judge hearing the motion nevertheless ordered the Commonwealth to enter the profile into SDIS.  *Id.* The Commonwealth complied, although the comparison search yielded no matches.  Compl. ¶ 34.

Dorothea Collins, the DNA Unit Supervisor-CODIS of the Massachusetts State Police Crime Laboratory, subsequently informed the FBI that while she believed the DNA profile was ineligible for inclusion in CODIS, the Commonwealth had been ordered to upload it into the state database.  FBI's Mem. at 4-5.  The FBI in turn declined to perform a matching search in NDIS.  *Id.* at 5.  More specifically, the FBI noted that three experienced scientists had all independently determined, according to the NDIS protocol, that the profile was ineligible for inclusion.  *Id.*  Because the condom was "covered in sawdust, dirt, and vegetation" when it was found, these scientists concluded that its condition was "not tied to the same time frame of the crime."  *Id.* at 9-10.  Furthermore, the condom's presence in a "lover's lane" area made it likely that it was an artifact of a past tryst, thereby

risking the implication of an innocent person in the crime. *Id.* at 11, 15. Plaintiffs then asked the Superior Court judge to order the FBI to enter the profile notwithstanding the determination of ineligibility. *Id.* The judge, citing a lack of jurisdiction, declined the request. *Id.*; Compl. ¶ 38. The Commonwealth then requested that the FBI conduct a keyboard search "out of respect for the Court's prior order." *Id.* ¶ 39. Once again, the FBI declined, repeating the prior explanation that "nothing forensically demonstrates a link between the victim and the subject condom to consider the obtained profile as coming from a putative perpetrator." FBI's Mem. at 5-6.

On March 26, 2018, plaintiffs – claiming that the FBI's refusal violated the DNA Information Act as well as their rights under the Fifth and Sixth Amendments of the United States Constitution – brought suit for injunctive and declaratory relief in federal court, relying on the Administrative Procedure Act (APA). Compl. ¶¶ 57, 60, 64; Pls.' Opp'n to Def.'s Mot. to Dismiss (Pls.' Opp'n) at 13. The FBI subsequently moved to dismiss, asserting that plaintiffs lack standing to litigate the issue and that the Complaint in any event fails to plead a viable claim. *See* Fed. R. Civ. P. 12(b)(1), (6).

## STANDARD OF REVIEW

Standing is a necessary prerequisite to a court's Article III authority to adjudicate a case, and challenges to standing therefore must be resolved before a court may reach the merits. *See Baena v. KPMG LLP*, 453 F.3d 1, 4 (1st Cir. 2006). "[A]t the pleading stage, the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate [its] standing to bring the action." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016). In this context, "[q]uestions of statutory interpretation are questions of law." *Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 170 (1st Cir. 2011).

If a plaintiff successfully establishes standing, he must state a claim for relief "that is plausible on its face" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This burden "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. However, in evaluating a motion to dismiss, the court takes the "factual allegations in the complaint as true and make[s] all reasonable inferences" in favor of the non-moving party. *See Mississippi Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 (1st Cir. 2008).

## DISCUSSION

### *Sovereign Immunity*

The FBI contends that because the DNA Identification Act gives it unbridled discretion over the eligibility requirements for CODIS, plaintiffs' claims are barred by the FBI's immunity from suit "as an arm of the state." Plaintiffs for their part argue that, because a meaningful standard for judicial review has been created by the DNA Identification Act and the NDIS Manual (when read together), the FBI's immunity has been waived for APA purposes. "The basic rule of federal sovereign immunity is that the United States [and its agencies] cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands*, 461 U.S. 273, 287 (1983). In certain circumstances, the APA waives sovereign immunity:

> A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.  However, there is a crucial caveat when equitable claims are asserted: "This chapter [of the APA] applies, according to the provisions thereof, except to the extent that . . . agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Therefore, if Congress vests an

8

agency with unfettered discretion in the implementation of a statute, a plaintiff's equitable claims remain barred by sovereign immunity.

Section 701(a)(2) is applicable "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). "Even when Congress has not affirmatively precluded judicial oversight, 'review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  When determining whether a statute falls within the discretionary language of § 701(a)(2), "careful examination of the statute" is required.  *Webster*, 486 U.S. at 600.

The DNA Information Act, in relevant part, states the following with respect to the storage of information in CODIS:

> The index described in subsection (a) *shall only include* information on DNA identification records and DNA analyses that are —
>
> (1)    Based on analyses performed by or on behalf of a criminal justice agency . . . in accordance with publicly available standards that satisfy or exceed the guidelines for a quality assurance program for DNA analysis, issued by the Director of the Federal Bureau of Investigation under section 12591 of this title . . . .

(3)     Maintained by Federal, State, and local criminal justice agencies . . . pursuant to rules that allow disclosure of stored DNA samples and DNA analyses only . . . .

    c. For criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged.

34 U.S.C. § 12592(b)(1), (3)(c) (emphasis added).  The statute's language is plain and "fairly exudes deference to the" FBI.  *Webster*, 486 U.S. at 600.  It therefore "foreclose[s] the application of any meaningful judicial standard of review."  *Id.*  No provision of the statute requires the FBI to enter samples into NDIS.  Quite the opposite.  The Act specifies what the index "shall only include," that is, those samples that meet the standards established by the Director of the FBI.  As the statute only establishes what may not be included in CODIS (samples that do not meet the Director's standards), the most that can be said is that it defines no more than an entry portal for samples that *could* be eligible for inclusion (that is, those that do meet the Director's standards).  Because the Act provides no guidance for samples that must be included, nor imposes any obligation on the Director to include any sample at all, I see "no basis on which a reviewing court could properly assess" the Director's discretionary eligibility decision.  *Id.*[1]

---

[1] While plaintiffs contend that the NDIS Manual operates to create a standard for judicial review when read with the DNA Information Act, just

NDIS' structure and purpose further support the conclusion that Congress intended for the gathering of samples under the DNA Information Act to be wholly discretionary.   NDIS' mission is to "identif[y] serial criminals by linking DNA evidence" from disparate crime scenes.   FBI's Mem. at 3.  The integrity of the NDIS is of paramount importance in attaining that goal.   The Director of the FBI has accordingly been given the sole responsibility of guarding the integrity of the index. If this court were to compel the Director to abandon that mission by entering a condom profile into NDIS that he has determined to be ineligible, the door would be open to further challenges to the Director's authority, leaving NDIS vulnerable to the forced inclusion of contaminated and, possibly, falsely incriminating evidence.  It follows that plaintiffs are precluded by Section 701(a)(2) of the APA from seeking either injunctive or declaratory relief in this court for violation of the DNA Information Act.[2]

---

the opposite is true.  The Manual unequivocally declares the FBI's broad discretion to manage NDIS as it sees fit: "The FBI . . . is responsible for determining issues of policy in its administration of [NDIS]."  NDIS Manual at 6.  Moreover, the Manual, like the Act itself, offers no direction as to when a sample must be included in NDIS.

[2] Even assuming, *arguendo*, that plaintiffs did have standing to bring their DNA Information Act claim, this court is doubtful that they would prevail.  A reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).

Constitutional claims, on the other hand, may be precluded by statute only when the "intent [of Congress] to do so [is] clear." *Webster*, 486 U.S. at 603. This heightened standard exists "to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (quoting *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681 n. 12 (1986)). The APA does not explicitly preclude bringing such claims; in fact, plaintiffs' equitable claims under the Fifth and Sixth Amendments would appear to fall within Section 702's explicit waiver of sovereign immunity in those cases in which a petitioner is "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act." 5 U.S.C. § 702. Consequently, the court will turn to the merits of plaintiffs' constitutional claims.

### Fifth Amendment Due Process

Plaintiffs claim that the FBI's refusal to upload the DNA profile into NDIS or perform a keyboard search violates their procedural and substantive rights to due process under the Fifth Amendment, "including their right to present evidence of third-party guilt in their upcoming retrial." Compl. ¶ 57.

---

Nothing in the FBI's decision rises to this level of capriciousness or indifference.

The FBI argues that plaintiffs fail to state a claim under either form of due process, as they have failed to allege that they have been deprived of a liberty interest or a property right by any action of the federal government or its officials.

When assessing a due process claim, the court undertakes a two-step analysis: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the [government]; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011). Plaintiffs' procedural due process claim fails at the outset. "There is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 837, 846 (1977).[3] It follows that a criminal defendant (state or federal) cannot invoke procedural due process as a mechanism to compel a federal agency – which has no connection to his prosecution by an equally sovereign entity – to undertake an affirmative exploration for exculpatory evidence that may or may not exist. While it is

---

[3] While a criminal defendant certainly possesses the "right to have 'a meaningful opportunity to present a complete defense,'" including presenting evidence of third-party guilt, this right pertains to the admissibility of evidence during trial, and not the gathering of evidence during discovery. *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (quoting *Crane v. Kennedy*, 476 U.S. 683, 690 (1986)).

true that "the government has the obligation to turn over evidence *in its possession* that is both favorable to the accused and material to guilt or punishment," *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (emphasis added), there is no duty on the part of the government to produce evidence that it neither possesses nor controls.  *United States v. Bender*, 304 F.3d 161, 163-164 (1st Cir. 2002).  This has all the more force when a defendant is not seeking to compel the production of evidence that is known to exist, but to compel an attempt to create it.

Plaintiffs also fail to state a claim for a violation of substantive due process.  To make out such a claim, plaintiffs must show "that they suffered the deprivation of an established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008) (emphasis in original).  "We have emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government,' . . . whether the fault lies in a denial of fundamental procedural fairness, . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective . . . ." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-846 (1998) (internal citation omitted).  To be actionable under the Due Process Clause, misconduct by

14

state actors must exceed a high threshold of allowance for human shortcomings in managing the intricate processes of government.

> [T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . . It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.[4]

Substantive due process is a doctrine reserved for egregious official conduct trenching on the most fundamental of civil liberties. "As a general matter, [we have] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). *See also Albright v. Oliver*, 510 U.S. 266, 272 (1994) ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). *Cf. Bielawski v. Personnel Adm'r*, 422 Mass. 459, 467 (1996) (Substantive due process is not an "open-ended . . . charter" for judicial interference with the duties of other government officials.).

---

[4] *Id.* at 849.

15

I would be hard pressed to find that the discretionary refusal of the Director of the FBI to undertake a task that he has reasonably deemed to be potentially destructive to his duty to protect the NDIS is a decision so arbitrary and cruel that it shocks the judicial conscience.  The substantive due process claim consequently fails as well.

### Sixth Amendment Compulsory Process

Finally, plaintiffs contend that the FBI's refusal to include the DNA profile in NDIS or to perform a keyboard search contravenes their Sixth Amendment rights, "including their rights under the Compulsory Process Clause."  Compl. ¶ 57.  The Compulsory Process Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. As with the Fifth Amendment, the Compulsory Process Clause "guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 324.

The Compulsory Process Clause does not confer upon a defendant a right to compel DNA testing during discovery; it rather protects a defendant's right to present evidence and testimony at trial. *See DiBenedetto v. Hall*, 272 F.3d 1, 8 (1st Cir. 2001).  Defendants are correct in their assertion that it would be an extraordinary and unprecedented weaponization of the

Compulsory Process Clause to construe it to "compel an agency totally uninvolved in [a] trial to not only contribute but develop evidence for a criminal defendant's case."  FBI's Reply Br. at 8.

## ORDER

For the foregoing reasons, the defendants' motion to dismiss is ALLOWED with prejudice.  The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE